**MIDWEST GROWERS COOPERATIVE CORPORATION, Plaintiff-Appellant,**

v.

**John H. KIRKEMO et al., Defendants-Appellees.**

**MIDWEST GROWERS COOPERATIVE CORPORATION, Plaintiff-Appellee,**

v.

**John H. KIRKEMO et al., Defendants-Appellants.**

**MIDWEST GROWERS COOPERATIVE CORPORATION, Plaintiff, Cross-Appellant,**

v.

**John H. KIRKEMO et al., Defendants, Cross-Appellees.**

**Nos. 74–2059, 74–2885 and 74–2926.**

United States Court of Appeals, Ninth Circuit.

March 26, 1976.

Rehearing and Rehearing En Banc Denied May 19, 1976.

William S. Scully (argued), of Hill, Farrer & Burrill, Los Angeles, Cal., for appellant, cross-appellant.

Dzintra Janavs, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellee, cross-appellee.

## OPINION

Before GOODWIN and SNEED, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Midwest Growers Cooperative Corporation brought this action seeking damages and injunctive relief against the Interstate Commerce Commission, the United States of America, various individuals as agents and employees of the Commission, and the United States Attorney and two Assistant Attorneys for the Central District of California, employees of the Department of Justice. The district court by summary judgment dismissed the causes of action for damages against all defendants and the ac-

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

tion in its entirety against the Interstate Commerce Commission. The court also entered a permanent injunction against the use of materials seized pursuant to an administrative inspection search warrant, which the court found illegal, and ordered the return of the materials to Midwest. The court inserted in the injunction by interlineation the words "without prejudice to the Government's pursuit of any lawful proceedings". Midwest has appealed from the judgment of dismissal. The defendants have appealed from the order granting the permanent injunction, and Midwest has cross-appealed from that portion of the injunction inserted by interlineation.

### Factual Background

Midwest is an agricultural cooperative association and operates trucks which make interstate shipments. Pursuant to 49 U.S.C. § 303(b)(5), it is exempt from regulation by the Interstate Commerce Commission. This section, as amended in 1968, restricts the availability of the agricultural cooperative exemption and requires those associations which haul goods for non-mem-

bers within the scope of the exemption to file notice with the Commission.[1] The 1968 amendment also added § 320(g),[2] which gives the Commission authority to inspect the books and records of those cooperative associations required to file notice under § 303(b)(5).

In compliance with § 303(b)(5) Midwest in 1969 filed a notice with the Commission of its intent to perform exempt interstate transportation for non-members. The Commission received reports that Midwest was exceeding the terms of its exemption and thus subject to penalty under 49 U.S.C. § 322(a).[3] An investigation resulted in a civil action against Midwest for injunction and forfeiture. This suit was settled in 1972, Midwest and its president agreeing to pay $20,000 and $10,000 respectively to the Government, without admitting liability for the alleged violations.[4]

The Commission continued to receive reports of allegedly improper shipments by Midwest. A new investigation was initiated by the defendant Kirkemo, a transportation specialist for the I.C.C. On February

1. 49 U.S.C. § 303(b) provides, inter alia:

   "Nothing in this chapter . . . shall be construed to include . . . (5) motor vehicles controlled and operated by a cooperative association . . . , but any interstate transportation performed by such a cooperative association . . . for nonmembers who are neither farmers, cooperative associations, nor federations thereof for compensation, except transportation otherwise exempt under this chapter, shall be limited to that which is incidental to its primary transportation operation . . . and shall in no event exceed 15 per centum of its total interstate transportation services . . . : Provided further, That any such cooperative association or federation which performs interstate transportation for nonmembers . . shall notify the Commission of its intent to perform such transportation prior to the commencement thereof . . . ."

2. 49 U.S.C. § 320(g) provides:

   "The Commission or its duly authorized special agents, accountants, or examiners shall, during normal business hours, have access to and authority, under its order, to inspect, examine, and copy any and all accounts, books, records, memorandums, correspondence, and other documents pertaining to motor vehicle transportation of a cooperative

   association or federation of cooperative associations which is required to give notice to the Commission pursuant to the provisions of section 303(b)(5) of this title: Provided, however, That the Commission shall have no authority to prescribe the form of any accounts, records, or memorandums to be maintained by a cooperative association or federation of cooperative associations."

3. 49 U.S.C. § 322(a) states:

   "Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not less than $100 nor more than $500 for the first offense and not less than $200 nor more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

4. The settlement agreement also provides in part:

   "IT IS AGREED AND UNDERSTOOD that any act or thing done by Midwest growers or James Cardwell, including but not limited to the specific acts or things set forth in the complaints in the pending actions, prior to

21, 1973 Kirkemo visited Midwest's office and requested to inspect its books and records pursuant to § 320(g). Kirkemo's request was refused by Midwest's secretary, who referred Kirkemo to the association's attorneys. Kirkemo met with the attorneys the same day and again on March 1, when he was told that Midwest would not permit inspection of its records on the basis of the decision of the United States District Court in *Interstate Commerce Commission v. Big Valley Growers Co-op.,* (Civil No. 72–2163), which held that the I.C.C.'s statutory right of inspection could not be enforced through injunction proceedings.[5] Kirkemo and defendant Nance, officer-in-charge of the local I.C.C. field office, made a second attempt to inspect Midwest's records on May 23, 1973. After again being refused access to the records, Kirkemo notified Midwest by letter that its action would "be deemed a knowing and wilful violation of [49 U.S.C. § 320(g)] on each normal work day of the year that such refusal continues." [6]

When Midwest gave no indication that it would acquiesce in the Commission's demand for inspection of records, the Government considered other options to enforce compliance with § 320(g). Defendant Griswold, I.C.C. Regional Counsel,[7] referred the matter to the Department of Justice for possible criminal prosecution. The case was assigned to defendant Bird, Assistant United States Attorney, who consulted with Griswold, Kirkemo, and United States Attorney Keller regarding the possibility of using an inspection warrant. In October, 1973 it was decided to apply for a warrant. Kirkemo made a final demand for access to Midwest's records, which was refused. Soon thereafter Bird prepared an affidavit for an "inspection warrant for an administrative search", which Kirkemo signed, a memorandum of legal points and authorities supporting the issuance of a warrant,[8] and the form for the warrant listing in detail the materials which were to be inspected.[9] On October 19, 1973 these materi-

the date of entering into the settlement agreement or the effective date of the dismissals of said actions, whichever is later, shall not be used by the Interstate Commerce Commission or the United States of America as evidence in any proceeding, whether administrative or at law, except that said acts or things may be used as evidence in criminal prosecutions for alleged violations of the Interstate Commerce Act which occurred prior to the date of entering into the date of this settlement agreement or the effective date of the dismissals of said pending civil actions, whichever is later, and/or any proceedings involving the fitness of the defendants as applicants in the proceedings before the Interstate Commerce Commission."

5. Subsequent to the search in question here, this court reversed the district court in *Big Valley Growers Co-op.,* holding that injunctive relief was a proper method of enforcing the statutory right of inspection of records. 493 F.2d 888 (1974).

6. Kirkemo had notified Midwest by letter dated May 15, 1973 of his intention to inspect the records on May 23, 1973.

7. Griswold had explained the Commission's position to Midwest's attorneys and told them the *Big Valley* decision was being appealed.

8. The magistrate was also presented with various investigative reports, which are set forth in the Commission's basis for believing that Midwest was engaged in illegal trucking activities. The reports included a recital of the background and terms of the 1972 settlement.

9. The warrant stated, *inter alia*: "Application having been made, and probable cause shown by John H. Kirkemo, Special Agent of the Interstate Commerce Commission, for inspection of the establishment described as:

MIDWEST GROWERS COOPERATIVE CORPORATION

7236 EAST SLAUSON AVENUE

LOS ANGELES, CALIFORNIA 90022,

pursuant to part II of the Interstate Commerce Act, specifically Title 49 United States Code, Section 320(g) and the decisions of the United States Supreme Court in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), you are authorized to enter the above described premises at reasonable times and during normal business hours and to inspect, examine and copy, in a reasonable manner and to a reasonable extent, the following files and records of Midwest Growers pertaining to the period of June 1972 to the present  .  .  " The warrant then listed 27 specific classifications of documents which the I.C.C. had authority to examine.

als were presented to a United States magistrate in an *ex parte* proceeding.[10]

The warrant was signed by the magistrate and executed on the same morning. Kirkemo, accompanied by defendants Mann and Herrick and a deputy United States marshal, presented the warrant to Midwest's secretary. Kirkemo again was referred to the association's attorneys. Kirkemo advised the attorneys in a telephone conversation that the inspection of the records would proceed without further delay.[11] The agents then handed Midwest's employees documents advising them that any effort to impede the search could result in imprisonment, and began accumulating the necessary records to accomplish the inspection. The inspection proceeded until the close of Midwest's business day. The agents returned the next day and throughout the following week, accompanied by defendant Rodders, another I.C.C. agent, and inspected the records and books of the cooperative, making copies and taking notes. The search was concluded on October 26, 1973, when the agents departed after returning the originals of documents they had inspected but retaining the copies for the Commission's further use.

### Proceedings in District Court

Midwest's complaint seeking injunctive relief and damages was filed on November 21, 1973. On March 25, 1974 the court granted Midwest's application for a preliminary injunction and defendants' motion for summary judgment. The motion was based on the pleadings, including affidavits of Midwest's secretary and attorneys attached to the complaint as exhibits, affidavits of two bookkeepers employed by Midwest, and affidavits of each of the individual defendants.

In granting defendants' motion for summary judgment and dismissing all causes of

action against the Interstate Commerce Commission and all causes of action for damages against the remaining defendants, the court entered findings of fact and conclusions of law. The court found, *inter alia,* that:

"Defendants Keller, Nobles, Bird and Griswold were at all times acting within the course and scope of their duties as attorneys for the United States and/or Interstate Commerce Commission and did not participate in any inspection . .

"Defendants Kirkemo, Mann, Herrick, Nance and Rodders . . . acted within the course and scope of their duties and employment in good faith and reasonably believing their actions to be legally valid and proper."

The court concluded as a matter of law that (1) the Interstate Commerce Commission "is not a suable entity"; (2) the United States had not consented to be sued for damages; and (3) the doctrine of official immunity precluded a suit for damages against the individual defendants.

On June 3, 1974 the court granted Midwest's application for a permanent injunction, concluding that the defendants had "unlawfully entered plaintiff's premises and seized and otherwise copied personal property belonging to plaintiff, including its books and records, in violation of plaintiff's Fourth Amendment right guaranteed by the United States Constitution". The court, however, modified Midwest's proposed order by interlineation to provide that the injunction was "without prejudice to the Government's pursuit of any lawful proceedings". The trial judge explained that this change in wording was required to leave "open to the government . . . an opportunity to proceed by way of injunction rather than by way of a search warrant . . . " to obtain Midwest's business records.[12]

---

**10.** Midwest was not given prior notice of this proceeding.

**11.** Midwest's attorneys requested Kirkemo to delay executing the warrant so that they could file a motion to quash with the magistrate or

the district court. During the week-long search, however, no motion was made to the court.

**12.** The court also modified the injunction prepared by Midwest to provide that the docu-

## Issues on Appeal

This consolidated appeal presents the following issues:

(1) whether the administrative inspection search warrant was valid;

(2) if not, whether the court properly held as a matter of law that the individual defendants were immune from liability for damages;

(3) whether the court properly dismissed the claims against the United States and the Interstate Commerce Commission; and

(4) whether Midwest was entitled to injunctive relief, and if so, whether the relief granted was proper.

## Validity of the Warrant of Inspection

■ It is a common practice in investigations by administrative agencies to use subpoenas duces tecum issued pursuant to specific statutory authority. The validity of such subpoenas is well established and agencies in utilizing investigative subpoenas are not subject to strict Fourth Amendment probable cause restrictions. See generally, Davis, Administrative Law Treatise §§ 3.04, 3.05 (1958), 1970 Supplement §§ 3.04, 3.05, 3.12. As the Supreme Court noted in *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401, 416 (1950), "it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant".[13]

Section 322(b)(1), instead of granting a subpoena power,[14] provides that the Commission may enforce its statutory right of inspection under § 320 by means of an injunction issued by the district court. Disclosure of records may be compelled by injunction without violating the Fourth Amendment, but the Commission in exercising its statutory power to inspect is limited by the same standards of reasonableness applicable to other administrative agencies. *Cooper's Express Inc. v. I.C.C.*, 330 F.2d 338, 340–341 (1 Cir. 1964). Under § 322(b)(1) reasonableness is insured by necessity of an adversary hearing before an injunction may be issued.

In *I.C.C. v. Big Valley Growers Co-op.*, 493 F.2d 888, 891 (1974), this court held that the statutory provision for injunctive relief contained in § 322(b)(1) should be extended to cover investigations of an agricultural cooperative association which has filed notice pursuant to § 303(b)(5) and refuses to permit an inspection of its books and records pursuant to § 320(g). We concluded that in enacting § 320(g), permitting the Commission to inspect books and records, Congress' failure to amend § 322(b) to provide for injunctive relief was a legislative oversight and that it was within the equitable power of this court to imply the injunctive relief necessary to give effect to the obvious intent of Congress.[15] In addition to this injunctive remedy, § 322(a) imposes

---

ments in possession of the Interstate Commerce Commission were to be turned over to the clerk of the district court for safe keeping pending appeal rather than to Midwest.

**13.** The Court explained in the earlier case of *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 195, 66 S.Ct. 494, 498, 90 L.Ed. 614, 622 (1946), that a subpoena is not an actual search and seizure and thus does not raise Fourth Amendment issues. More recent cases have ignored the distinction in *Walling* between investigations through subpoenas and investigations through actual searches and have treated *Walling* and *Morton Salt* as establishing a separate rule for administrative agency investigations. See, e. g., *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 254, 13 L.Ed.2d 112, 119 (1964).

**14.** Under Part I of the Interstate Commerce Act, the Commission may subpoena books and records of railroad and pipeline carriers (49 U.S.C. § 12(1)) and may apply to the federal courts for enforcement orders, § 12(3). Under Part II of the Act, regulating motor carriers, the subpoena power has been replaced by the provision of § 322(b)(1), permitting the Commission to enforce its inspection orders by applying for an injunction.

**15.** In *Big Valley*, the Commission argued that if injunctive relief were denied, the Commission would have been granted a right but no remedy. We agreed and concluded that injunctive relief was the proper remedy. We noted also that § 322(b)(1) injunctions are not subject to the traditional requirements for equitable relief—lack of legal remedies and irreparable harm.

criminal penalty upon a cooperative refusing access to records subject to inspection.

There is no express authority in the Interstate Commerce Act, however, for the Commission to use an "administrative inspection search warrant" to enforce its statutory right of inspection. This procedure, as shown by the present case, is a radical departure from the injunctive procedure established by Congress, since it would permit the warrant to be issued *ex parte*, without prior notice to the carrier whose records are to be searched. While we concluded in *Big Valley* that injunctive relief could properly be implied to give effect to the intent of Congress, there is nothing in that opinion to suggest that the use of an inspection warrant could be similarly implied.

Neither party has cited, nor have we found, any other case which has considered the question of whether the Commission may utilize administrative search warrants to effect their right of inspection. The defendants rely on three decisions of the Supreme Court which they contend provide a basis for the generalized use of search warrants by administrative agencies: *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); and *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1969). After reviewing these decisions and numerous lower federal court cases which have applied their principles, we are not persuaded that they support defendants' contention.

In *Camara* the Court held that Fourth Amendment protections against unreasonable searches were applicable to health, safety, and fire inspections of personal residences by administrative agencies. In the companion case of *See v. City of Seattle*, the Court extended this principle to administrative inspections of commercial proper-

ty. While the Court in *See*, 387 U.S. at 545, 87 S.Ct. at 1740, 18 L.Ed.2d at 947 stated that "administrative entry, without consent . . . may only be compelled . . . within the framework of a warrant procedure", the Court did not say that entry may *always* be compelled through administrative warrants. In *Colonnade v. United States*, the Court held forcible non-consensual searches by the Alcohol and Tobacco Tax Division could not be accomplished without a warrant. There is nothing in the language of any of these decisions to indicate that the Court was fashioning a general rule to allow all administrative agencies to utilize search warrants for their investigations.

In *Camara, See*, and *Colonnade*, the administrative agencies before the court had express statutory authority to enter buildings to make their inspections.[16] Further, despite the restrictive language used in *See*, the Court approved of two other types of administrative inspections to which it declined to extend Fourth Amendment warrant requirements: inspections by use of administrative subpoenas (387 U.S. at 544, 87 S.Ct. at 1739, 18 L.Ed.2d at 946) and "licensing programs which require inspections prior to operating a business or marketing a product" (387 U.S. at 546, 87 S.Ct. at 1741, 18 L.Ed.2d at 948). We agree with Midwest that these cases may not be construed to create a right to an *ex parte* search warrant. Rather they make obtaining a valid warrant a prerequisite for prosecution for refusing to permit inspection of premises where the agency has a right of entry. In the context of the question presented in this case *Camara, See*, and *Colonnade* lead us to conclude that non-consensual administrative searches may be accomplished through warrants of inspection when the administrative agency is granted by Congress the power of entry to make its inspections. In the absence of statutory

---

**16.** In *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Court approved a warrantless, nonforceable search under the Gun Control Act of 1968. In *Biswell* the Court stressed that Congress had granted the administrative agency the authority to enter premises during normal business hours.

authority to enter, the agency must utilize other investigatory techniques.[17]

Section 320(g), upon which the Commission based its request for the administrative search warrant, provides that the agency shall have "access to and authority . . . to inspect, examine, and copy" business records. Unlike the statutes and ordinances considered in *See, Camara,* and *Colonnade,* the Commission is not given the authority under § 320(g) to enter the carrier's premises without consent to make its inspections. There is nothing in the legislative history of the statute or in case law to indicate that a right of entry should be implied in section 320(g). The procedure established by Congress to enable the I.C.C. to carry out its obligation to monitor motor carriers, which was extended to apply to agricultural cooperatives in *Big Valley, supra,* is to obtain an injunction requiring the non-consenting carrier to comply with the inspection order. This procedure, combined with the Commission's power to file criminal charges against a non-cooperating carrier, constitutes the extent of the Commission's authority to inspect. We agree with the district court that the warrant obtained by the Commission to inspect Midwest's records and books was without statutory or legal basis.

*Immunity of Individual Defendants*

Having concluded that the inspection warrant procedure followed by the Commission was without legal authority, it is necessary to determine whether any of the defendants may be liable for damages. First, with respect to the individual defendants,

was their conduct protected from damage liability under the doctrine of official immunity?

In *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103 (1974), the Supreme Court, after reviewing prior cases involving immunity of officials of the executive branch of the Government, concluded that the immunity for executive officials is not absolute, but that "a qualified immunity is available . . ., the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based".[18]

This court recently, in *Mark v. Groff,* 521 F.2d 1376 (1975), analyzed the prevailing standards of official immunity in the light of *Scheuer v. Rhodes; Bivens v. Six Unknown Named Agents,* 456 F.2d 1339 (2 Cir. 1972);[19] and *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), upon which all parties herein rely. We concluded that, "Under the qualified immunity doctrine, a government officer performing acts in the course of official conduct is insulated from damage suits only if (1) at the time and in light of all the circumstances there existed reasonable grounds for the belief that the action was appropriate *and* (2) the officer acted in good faith." 521 F.2d at 1379–1380.

After reviewing the record, including affidavits of each of the defendants and affidavits filed on behalf of the plaintiff, the district court concluded as a matter of law that the acts of the officials named as defendants were within the scope of their authority and were performed in good

**17.** Two circuit court decisions have held that *See* and *Camara* did not change the authority of administrative agencies to utilize their previously well established power to issue investigative subpoenas. *United States v. Roundtree,* 420 F.2d 845 (5 Cir. 1970); *Securities & Exchange Com'n v. Brigadoon Scotch Dist. Co.,* 480 F.2d 1047 (2 Cir. 1973).

**18.** In explaining the doctrine of official immunity the Court noted that, "Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that

they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all." 416 U.S. at 242, 94 S.Ct. at 1689, 40 L.Ed.2d at 100.

**19.** *Mark* in analyzing the question of immunity, utilized the Second Circuit opinion in *Bivens* which was an application on remand of the principles established in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

faith, "reasonably believing their actions to be legally valid and proper". We agree.

■ It appears from the affidavits and official job descriptions of the defendants Kirkemo, Mann, Herrick and Rodders that as agents of the Commission they participated in the investigation under direction from their superiors and under a good faith belief that they were operating under a valid warrant issued by a United States magistrate. The search was conducted without violence, at reasonable times, and without undue interruption of Midwest's business. Defendant Nance was involved in the investigation only peripherally as the person who assigned Kirkemo to the investigation and acted as liaison between Kirkemo and the Commission and Department of Justice. He too acted in good faith under a belief that his conduct was authorized by law.

■ The defendants Griswold, Bird and Keller analyzed the statutes and case law to determine what proceedings might be instituted to enable the Commission to enforce its statutory right to inspect Midwest's records. They concluded that the inspection warrant procedure was authorized by law. Although we decide that their conclusion was erroneous, we find nothing in the record to indicate that these defendants did not at all times act in good faith, based upon a reasonable belief that the warrant

procedure was a valid exercise of the Commission's right of inspection.[20] The defendant Nobles, Assistant United States Attorney, had no personal knowledge of the investigation and is clearly immune from any claim for damages.

The affidavits of the defendants set forth facts which, if accepted, would entitle them to summary judgment. The affidavits submitted on behalf of the plaintiff did not raise any triable issues of fact with respect to whether the defendants were acting in good faith based upon a reasonable belief that their actions were proper.[21] Under Rule 56(c), F.R.Civ.P., the district court could properly conclude that there was no genuine issue of any material fact and that the defendants were immune from liability for their conduct in the investigation.[22] See *Burgwin v. Mattson*, 522 F.2d 1213, 1214 (9 Cir. 1975).

### Immunity of United States and I.C.C.

In dismissing the damage claims against the I.C.C. and the United States, the district court concluded that the Commission was not a suable entity and that the action against the United States was barred by the doctrine of sovereign immunity. Citing authority critical of the sovereign immunity defense, Midwest contends that the court erred in dismissing the actions. We find no error in the district court's determination of this issue.

---

**20.** As noted supra, when counsel resorted to the inspection warrant procedure, the district court had held in *Big Valley* that remedy by injunction was not available. While this holding was later reversed, it did at that time preclude injunctive relief and made it necessary to seek an alternative method of enforcing the right of inspection. It may be noted also that Midwest took no steps to restrain the use of the warrant search until after the week's inspection had been completed, when it filed this action.

**21.** We find no merit in plaintiff's contention that the Commission's utilization of an *ex parte* proceeding to obtain the search warrant constituted an act of bad faith. Having decided that the warrant was legally authorized, the defendants used the traditional method for obtaining a search warrant—appearing before a United

States magistrate in a nonadversary proceeding. Nor can we agree that calling the magistrate's attention to the Commission's prior settlement with Midwest is evidence of bad faith. The agreement required the I.C.C. to refrain from using as evidence in future proceedings the acts which were the subject of the 1972 agreement. The agreement did not preclude I.C.C. from referring to the fact that there had been a settlement of a prior action.

**22.** Having determined that the defendants acted in good faith within the doctrine of qualified immunity, it is unnecessary to consider the defendants' contention that *Scheuer v. Rhodes, supra*, is factually distinguishable and that under *Barr v. Matteo, supra*, there is an absolute immunity with respect to all categories of defendants.

Although the sovereign immunity doctrine has come under attack,[23] it is an "accepted jurisprudential principle that no action lies against the United States unless the legislature has authorized it". *Dalehite v. United States*, 346 U.S. 15, 30, 73 S.Ct. 956, 965, 97 L.Ed. 1427, 1438 (1953). It is similarly well established that federal agencies are not subject to suit *eo nomine* unless so authorized by Congress in "explicit language". *Blackmar v. Guerre*, 342 U.S. 512, 515, 72 S.Ct. 410, 411, 96 L.Ed. 534, 539 (1952). Two statutes provide general authority for the United States courts to entertain damages suits against federal government—The Federal Tort Claims Act (28 U.S.C. § 1346(b) and § 2671, *et seq.*) and the Tucker Act (28 U.S.C. § 1346(a)). Neither of these statutes is applicable here. Sections 2680(a), (c) and (h) of the Tort Claims Act specifically except from the coverage of the Act discretionary and intentional acts of the type alleged by the plaintiff. Cf. *United States v. Faneca*, 332 F.2d 872, 874–875 (5 Cir. 1964); *Dalehite v. United States*, supra, 346 U.S. at 34–36, 73 S.Ct. at 965, 97 L.Ed. at 1439–1440. The Tucker Act expressly provides that jurisdiction under its provisions shall not extend to cases "sounding in tort". 28 U.S.C. § 1346(a)(2).

Under the sovereign immunity doctrine, unless the Government consents to being sued, neither it nor its agencies may be made parties in damage actions. Absent this consent, the district court properly concluded that it was without jurisdiction to entertain the damage claims against the United States or the I.C.C.

### Propriety of Injunctive Relief

The permanent injunction entered by the district court orders the return to Midwest of all books, records and documents seized and prohibits the named defendants, "the United States of America, and their agents, employees and representatives and all entities and persons in concert or participation with them" from using "as evidence in any criminal or civil procedure against plaintiff under Part II of the Interstate Commerce Act plaintiff's property, including its books and records which defendant seized, inspected, examined, copied or abstracted during the period, October 19, 1973 through and including October 26, 1973". By reason of the invalidity of the warrant, the court properly ordered the return of the materials seized. We conclude, however, that the injunction is overly broad, premature, and legally improper.

Insofar as the injunction seeks to restrain the United States and its agencies, it is barred by the doctrine of sovereign immunity. It is well established that suits to enjoin the United States or its agencies, like damage suits, cannot be maintained unless the Government first consents. *Dugan v. Rank*, 372 U.S. 609, 617–619, 83 S.Ct. 999, 1004–1005, 10 L.Ed.2d 15, 21–22 (1963); *City of Fresno v. California*, 372 U.S. 627, 629, 83 S.Ct. 996, 997, 10 L.Ed.2d 28, 30 (1963); *Cotter Corporation v. Seaborg*, 370 F.2d 686, 691 (10 Cir. 1966). Congress has enacted no statute which may be interpreted as providing consent for this suit.[24] The injunction against the United States accordingly is improper. The district court properly declined to extend the injunction to the I.C.C.

Although sovereign immunity does not bar the suit against the federal agents named as defendants, since they are alleged to have acted illegally (*Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628, 1635 (1949)), we question the propriety of enjoining the individual defendants from making any use of the information obtained through their search of Midwest's office. In the first place, plaintiff has failed to show either irreparable harm or lack of any adequate remedy at law—both

23. See, *e. g.*, Davis, Administrative Law Treatise, 1970 Supplement §§ 25.00, 27.00.

24. In *Anderson v. United States*, 229 F.2d 675 (5 Cir. 1956), the court noted that 28 U.S.C. § 1331 providing district courts with "federal question jurisdiction" cannot be construed as a waiver of sovereign immunity. See also *Cotter Corporation v. Seaborg, supra*, 370 F.2d at 692, n. 15.

prerequisites to injunctive relief. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12, 20 (1975).[25]

In the second place, it is impossible to determine now what, if any, use the defendants will make of the materials and information obtained in their search. In any future action in which the defendants may seek to use the material, the court may properly consider Midwest's motion to suppress, and whether the search was in violation of the Fourth Amendment. This remedy is adequate to redress whatever abuses may have occurred in the search.

Moreover, there may be contexts in which the evidence obtained from Midwest could be admitted despite the illegality of the search. As the Supreme Court noted in *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974): "The exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." When evidence is sought to be suppressed the court must consider the purpose of the rule—to discourage unlawful conduct by government agents—and the nature of the proceeding involved. In performing such a balancing test the Seventh Circuit recently held in *Honeycutt v. Aetna Insurance Co.*, 510 F.2d 340, 348 (1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975), that the exclusionary rule does not extend to certain civil cases. Since it is impossible to predict what future use may be made of this evidence an injunction against all use at this time is premature and improper.

## CONCLUSION

We conclude that:

(1) The inspection search warrant was invalid; (2) the district court properly held as a matter of law that the individual defendants were immune from liability for damages; (3) the court properly dismissed the claims against the United States and the

Interstate Commerce Commission; (4) the court properly ordered the return to Midwest of all books, records, and other material seized in defendants' search; and (5) the permanent injunction against all future use of the information and materials obtained was improper and should be dissolved.

Affirmed in part, modified in part, and remanded for dissolution of permanent injunction.

**25.** In *Rondeau*, the Court, in resolving conflicts in the courts of appeal, held that a showing of irreparable harm, in accordance with traditional principles of equity, was necessary before a private litigant could obtain injunctive relief based upon § 13(d) of the Securities Exchange Act. 422 U.S. at 57–65, 95 S.Ct. at 2075–2079, 45 L.Ed.2d at 20–24.